Good morning, ladies and gentlemen. Our first case for argument is United States v. Batio. Mr. Lamba. Good morning, Your Honors, and may it please the Court. My name is Matthew Lamba of Perkins Coie, and I'm representing Jeffrey Batio in this appeal. Now, I'd like to reserve five minutes of time for reply before diving into my argument. This case is about whether the government can pursue criminal penalties for business decisions with which prosecutors in their discretion disagree, sweeping away the safeguards provided to corporate executives in the civil context. Here, the government prosecuted an ambitious entrepreneur engaged in over a decade of product development, hoping to launch the next revolutionary technology product. He raised money from investors, as nearly all entrepreneurs must do, and spent much of it paying employees and contractors, renting facilities, building prototypes, and taking a small salary for himself. When he was unable to get his products into the hands of the masses, disgruntled investors got the government to act on their behalf. At best, it should have been a civil dispute between the investors and a chief executive of a company, not a case that warrants the government spending public personnel, time, and money to prosecute. Here, there is no— This sounds like a speech you make to the prosecutor before the prosecution decision, but we're here after a jury verdict. Time is short. You might want to address the legal issues that pertain after the jury is convicted and the district judge had said there was plenty of evidence. Yes, Your Honor. Here, there is no well-defined scheme, and that is one of the requirements of the mail-and-wire fraud statutes. I'm not sure that that's true, though. I mean, I would like you to explain to me why Mr. Battio's repeated statements that product was, quote, ready to ship were not false and misleading statements. He said this. In my lay understanding of ready to ship doesn't mean sometime in the next decade. It means ready, like in the next month or so. He would take orders. He would promise to personalize things. How is that not just an out-and-out misrepresentation? Your Honor, I believe there is disagreement on whether he was taking orders for products. I believe you may be referring to the- We have to take the evidence in the light most favorable to the jury verdict. So you should address Judge Wood's question as posed. Yes, Your Honor. There were no orders for sales. I believe Your Honor is referring to the Indiegogo fundraising campaign where he solicited contributions for perks or rewards. Those sites are crowdfunding organizations. But in 2016, as I read the record, you can tell me it's not there, but I think it is, he allows pre-orders on this Indiegogo site. He posts an update saying shipping is expected to begin the first week of August 2016. He posts misleading videos of his wife holding a so-called prototype, which is nothing of the sort. Just for one example. I mean, there are many, many examples in the record, but how about that one? Well, Your Honor, I think that falls to the burden of the government to show at the time he made those statements, he didn't genuinely believe. Well, that's what the jury concluded under the instructions he was given. That is, Your Honor. And as for the video that's referenced, the updates provided around the time that that video was posted revealed that it could not possibly be a demonstration of a final completed product. So what does he mean when he says to his contributors, you can see the working prototype in action? Yes, Your Honor. That was a product demonstration video in which he was showing features being And, in fact, in some of the updates that accompanied those videos, he informed contributors that in March 2016, for instance, he has been working on a pre-production prototype, meaning that a final prototype had not even been completed at that time. It sounds like you're asking us to reweigh the evidence, which post-verdict, getting over the hurdle of a sufficiency of the evidence is not asking us to reweigh it. Your Honor, we are not asking for this court to reweigh the evidence. We are pointing to additional facts that the government did not want to discuss in detail at trial that show there should have been a reasonable doubt. How do you get around the Sony statements when your client told investors that his company was currently in discussions with Sony Electronics on partnering licensing the products, and the executive from Sony testified that he never discussed Sony licensing with your clients? There is a dispute as to the Sony licensing elements, and the government had failed to show at trial that Mr. Badio did not genuinely believe he was in licensing discussions with Sony at that time. He made a representation. There is evidence in the record that he affirmatively made this representation to some of his investors, and the evidence from Mr. Martin, Sony's employee, was crystal clear. I've never had those discussions. How do you get around that post-verdict? Well, I think it turns on whether Mr. Badio thought that he was having discussions with Sony regarding licensing. Of course that he was insane. How else do you think you're having discussions when there are no discussions? Well, he did have a discussion with the CIO of Sony. They had two Radian prototypes deployed at Sony's offices. But that's not licensing. He had a discussion where he was hopeful, but his misrepresentation was specifically about partnering and licensing. And I think that falls on the government to show how Mr. Badio construed those representations from Sony. No, but the jury can infer from all of this evidence. Usually people don't have some device that you can shine in their brain and you find out what they're thinking. We have the Sony executive saying nothing of the sort. Maybe I told him he could put a couple of things in the office. That's a far cry from licensing discussions with a major company like Sony. Yes, Your Honor. But, again, I would return to it was the government's burden to show help. And they did. The jury was persuaded. Again, I think Judge St. Eve is exactly right. We are not here to be the jury. Maybe we should talk about something else. Yes, Your Honor. And one thing I would like to highlight about this points to one of the fundamental issues with the government's case below. They alleged a 13-year scheme starting from 2003 and extending through 2016 and said this was the entirety of Mr. Badio's operations in this time was one large ploy to defraud investors. The government went all in on this contention, and this was an unforced error. The government could have alleged multiple schemes or smaller schemes, but what it said was it was one, and that's what it had to prove at trial. And in U.S. v. Camille, coming out of the Third Circuit, that court found that an acquittal is warranted when the government defines the scope of its scheme broadly and then fails to prove it at trial. But here's the problem with this. Again, could a jury have rejected the idea of one scheme? Perhaps, yes. But that's not the question. These various companies that he used were tightly related to one another. He was doing the same thing, this whole thing, which, to be quite honest, does not strike me as such an amazing idea that you could have a laptop and a tablet and a phone all docked in the same thing so they were somehow interactive. It just doesn't strike me. But anyway, that's not the question. He is doing the same thing with these products from start to finish, or there's evidence that a jury could credit that he is. So I don't see where there is such a failure of proof that you've met the standard for setting aside a verdict. Well, I'd like to turn to the 2003 to 2007 timeframe in particular as an example of where the government's evidence falls short. To start, to show the start of the scheme, the government points to a 2003 private offering memorandum, which I'll refer to as a POM, that Armada had released. Please don't. Don't. Please use real words. Yes, Your Honor. I will refer to it as a private offering memorandum that Armada had released to potential investors. Now, this is a legal document that not even the government-alleged Mr. Badio had drafted himself, but they focus on a single line in that private offering memorandum that said the first product Armada intended to ship, or to pursue, I should say, was the Phantom, was that it was, quote, virtually complete from a design perspective. And approaching market readiness. Yes, Your Honor. Which it was not, because by 2006, maybe at most they had a proof-of-concept prototype, but it had failed safety testing. It was not approaching market readiness. Well, Your Honor, that was Armada's second product, the Radian. The 2003 private offering memorandum referred to the Phantom, which was intended to be an updated version of the Voyager product that Mr. Badio had spent years developing at Zentex, which the government does not allege was part of the fraud. So according to the government's theory in this case, at the formation of Armada in 2003, he had already devised a massive scheme to defraud investors, rendering the entirety of his pursuits at Armada and beyond null. It was a road to nowhere. But it's not like he's in the goat milk business one day, and the next day he's in the computer business. He is continuing with this story, I guess I'll say. What about late 2008? He tells investors that he's, quote, actually beginning the process of building and shipping the first Radians, whereas, in fact, at that time he had stopped paying rent for this gigantic warehouse that he had located, and he didn't have any employees. That, Your Honor, was because, and I don't believe this fact was disputed at trial, he had run out of money at that time. But he's still making representations that it's ready to go. Even though he's run out of money, he can't continue to pay the engineer. And in those statements where he was saying it was ready to go, he had made clear to potential investors that additional funds would be necessary to carry it. But it wasn't ready to go. That's the problem. If he had said, oh, I'm out of money, it's not ready to go, I need more to get it ready to go, that would be a different story. But that's not what he said. He repeatedly told them over and over, it's approaching market readiness. I'm ready to take preorders. That's a very different scenario than you are asking us to look at this evidence as. Yes, Your Honor. And that's why if this court were to find some basis to affirm a jury's finding of a scheme, the issue still fundamentally resolves down to whether the government proved the entire scope. It is the government's burden to show when Mr. Lembo, I'm going to repeat what Judge Easterbrook started out with. You may have stronger arguments than sufficiency of the evidence here. That's an uphill battle, no matter what the case is, but I think you may have better arguments here. I would like you, for example, to address your argument about the calculation of the loss and the   I think it's a good argument to address the loss and the calculation of the restitution. Yes, Your Honor. There are a few points on loss amount and restitution. This ties a bit into sufficiency of the evidence because if the government failed to prove the scheme started in 2003, but started at some point later most of the funds that were raised were from the 2004 to 2007 timeframe, which would cut. Can you show me why any of this money, let's take the number that the district court used, which was approximately 5.7 million for loss amount, turned out to be a little bit less for restitution, more in the 5 million range. So did anybody get any benefit whatsoever from this money? They got the value of Mr. Badio's services and the one thing I would like to stress, what's the value of his service at this point? Isn't it zero? It is trying to bring a product to market. This was a high risk investment that the investors understood when they made their investments. And if loss amount can be calculated as every dollar investors contribute to a project that ultimately fails, then any entrepreneur will be liable for the entirety of their pursuits. If they're defrauding people. Yeah. But not, not everybody defrauds people and tells them that something is ready when it isn't. Yes, Your Honor. Our position would be that the government had failed to prove the entirety of the scheme. So a significant portion of that loss should not be attributable to the actual, to any fraud that this court might find for affirmance. But this isn't as though suppose counterfactually he had sold, you know, a thousand units, promising that they would have all sorts of fabulous performance characteristics. And in fact, they were just, you know, no better than, you know, a low end Chromebook that you could buy, you know, anywhere around. So in that instance, you would offset the value that you actually got from the product as against the amount that people paid thinking, you know, believing the fraudulent statements. But in this case, they got nothing. They just sent their money off into the stratosphere and in a way it went. So why isn't that both the loss amount and in this instance, the restitution amount? Because there were genuine investments in attempts at product development. What case do you have that says that valueless and from, from the point of view of the, of the funds contributor, investments that proved to have no value, you're making a big social argument that yes, we like innovation in our society. We're all well aware that many innovative efforts don't come to fruition. That's the nature of things. The pharmaceutical companies would be happy to tell you most drugs fail, you know, lots of things like that, but we're at a different stage of the process. Now we're saying you defrauded people and now we need to compute what sentencing criteria should be used and also how much money you have to pay back. Yes, Your Honor. And our position would be that genuine product development for efforts that failed should not be included in that loss amount. Who says that? I mean, I would have to find a particular case, Your Honor. Well, maybe there is a case. I don't know where it is. Yeah. Yes, Your Honor. I would have to look that up for you separately. I don't have it. You have briefed it though. Isn't that central to your argument? Well, I think this is one of the issues that may not have been addressed by courts previously about whether entrepreneurial endeavors, how to calculate loss. How can that be when there's a scheme to defraud, when he's convicted of a scheme to defraud and there's no product that was ever developed that sold? Yes, Your Honor. Most entrepreneurial endeavors do not succeed in an ultimate product. And if the government can point to what it classifies as misrepresentations after the fact, that would expose entrepreneurs to liability. Not if they're honest about what they're doing. I mean, you can read the Wall Street Journal every day. You find out, you know, that people are experimenting with different kinds of, you know, solar panels or they're, you know, they tell you what they're working on, but they don't have to lie about it. They decide what they're going to disclose to the public and they do. Yes, Your Honor. I would like to reserve the rest of my time for reply. Certainly, counsel. Ms. Greenwald. Good morning, Your Honors. I think I'll start with the loss. Our position on loss and restitution is that it was waived. This is a clear case of waiver with loss. The court asked three times whether he had any objections and the only one raised was criminal history. On the loss amount, he did file written objections in advance. He did. The restitution is separate because there was not an objection to that and I think there was a strategic choice at sentencing regarding that. But on the loss amount, why wouldn't it be forfeiture rather than waiver because he did submit written objections in advance and we have some case law suggesting that is sufficient to at least make it a forfeiture issue. Agreed, Your Honor, except that here what happens is, in addition to at sentencing being asked three times and referring to criminal history alone, it's also clear there was a strategic decision made here because what happens is the main argument he had on this loss figure was that braver evidence that had no foundation. That's the evidence where he just told the man the numbers to be put in and that the QuickBooks had been... Exactly, and braver when he did testify, he said he didn't even know who prepared, he couldn't remember who even prepared these QuickBooks that could be altered. But the bottom line is at page 38 and 30, what happens is the court then finds the loss amount, adopts what's in the PSR that's very well supported. I think that was supported by the FBI agents' charts and testimony. Charts, exactly, Your Honor, and testimony. And then what happens is after the court has determined the range, they then turn to mitigation where within that range. And that's when he calls braver. And when the government objects to braver testifying, the defense attorney's response, and this is at the sentencing transcript at page 38 to 39, this is mitigation. So this record is clear. They made a strategic choice by the time of sentencing, although they had argued it before, but by the time of sentencing, there's a strategic choice to accept the loss amount and then raise it in mitigation. And that was a smart choice or a reasonable choice because there was, as the district court repeated at sentencing what she'd said at trial, which was, there's no foundation for this. I do not find this... is it to be anything that's worth relying upon. How do we deal with our case law, then, talking about preserving at least to the... making it more of a forfeiture issue if you file written objections in advance? I don't read the case law as being that clear, Your Honor, saying that... It is a little murky. It certainly says it, but I think if you have... I would say that this is an exception to those kind of cases. And to the extent there's ones about filing something before, there's just as much ones that when you're asked... I would argue that when you're asked repeatedly at sentencing in a record like this where you've raised it before and now it's sentencing, you keep getting asked and you don't raise it, and then you say you're raising it only in mitigation, that that's showing you have now... You were... This isn't forgetting. You were aware. You wrote something and submitted it. Should there be some obligation to have the defendant withdraw the prior written objections in order for it to be a waiver versus forfeiture issue? I don't believe so, Your Honor. Not on a record as clear as this. I mean, a court certainly could do that, and that would be no question. It would be clear. But I just think... We like clarity. Of course. But even if we turn to plain error here, even without plain error, the defendant has to show on appeal that it's outside the realm of permissible computations, but this would be under plain error. There is nothing in this record to, A, make that braver's estimate that $4.5 million of the $5 million was spent on business expenses. That's totally unsupported. But, you know, this is a weird record because it's hard to find much of this money going to him, and the district court judge mentions that. The judge seemed to have been lining his own pockets. I'm just trying to figure out what happened to this $5 million and some over the course of 13 years or whatever. Well, nobody is suggesting that he took the money and ran to Hawaii or opened, you know, did a castle. But, you know, human nature can be run on many different things. For example, we know... First of all, we only have bank records from 2007. He took $200,000 in one case. In 2008, 200... When the defense counsel says they ran out of money in 2008 and couldn't pay grieves, well, he transferred $200,000 in that year to his own personal bank accounts and $75,000 of it during that very period when he's not paying grieves. So, you know, did he spend money? He spent money to make money, essentially, I would argue. He spent, you know, money on this warehouse to produce a product he didn't have. He spent money on, you know, making hollow frames that he could use in videos. He spent lots of money on videos to raise money. And this is all... I mean, that's why I say it's a somewhat strange case. You're used to seeing people with these schemes who live a very luxurious lifestyle because they're taking other people's money to do it with. You can understand why he is emphasizing, hey, I was just an entrepreneur. I kept, you know, I was a person full of hope. You know, I kept thinking it was going to work out. Never did. And then, all of a sudden, the government swooped in and indicted me, so, of course, it wasn't going to after that. You have to be taking a position that it really actually doesn't matter what happened to the money. Exactly. And it doesn't matter what happened to the money. It doesn't matter what his motivation was. He could... You know, humans are complex. Maybe he just enjoyed feeling like he was the next Steve Jobs. Who knows? Doesn't matter. He lied to get money. And the jury's... As the court has pointed out, the evidence, you know, that we're on appeal and the evidence and inferences from it amply support the jury's verdict that... Can you talk in that connection about the last paragraph of this good faith instruction? Yes. Honest and genuine belief that you're going to be able to perform is not a defence if you also knowingly made false and fraudulent misrepresentations. You know, he says, oh, you know, one lie and you're out the window. Nothing in that instruction says that. If defence counsel has a problem with one material misrepresentation being enough for a fraud, his argument is with the black letter law in the elements instruction, which says that. It says that the government has to prove a scheme to defraud and it has to prove a material misrepresentation as part of that fraud. So his argument is with well-established black letter law. It's not with honest belief instruction. The Third Circuit withdrew this paragraph. Yes. I don't know if it was identical, but it was similar... It was. ...from its pattern jury instructions. And I know they had the tax fraud case, which was different than this. Yes. But then they went and withdrew it from their pattern instructions. Yes. Is that a flag for us, that there's a concern with this? I tried to look into that. I actually even contacted the US Attorney's Office there to try. They just don't have any information about the rationale of that committee. So all we really have to go on is this case, this Basel case. And what's interesting about it is in the context of that case, it's not clear that they gave this honest belief instruction in the context of a whole good faith instruction. It just looks like they just isolated this one instruction. And the court in Basel doesn't consider it in the context even of the elements instructions. That's not this case. Separate from this case, is there some concern we should have about this paragraph in the pattern jury instructions? You know, I don't believe so. I believe it's a clear instruction, especially when given in the context. This circuit's instructions don't suggest that it be given out of context of the good faith instruction. So in that context, it's basically supporting the clear law, which is that you can have whatever good intentions you want. You can believe you're going to produce this product at the end of the day, but you can't lie along the way to get there. So the instruction troubles me because I think it is a little murky. I can come up with ways of understanding it that would be consistent with the law. So if you think you're going to pay back all this money and so on, that doesn't... So that's like that you will be able to perform what you promised. That's a vague statement. Well, you know, certainly the government's not going to stand in the way of the court, you know, contemplating it. But in the context of this case, there is no way it could be construed as now saying that, you know, one misrepresentation and you're out, much less one trivial misrepresentation and now you've got a conviction. And notice, you've just added a word. This instruction just says, if you also knowingly made false and fraudulent misrepresentations. There's nothing about materiality. Well, not in that instruction. However, and this was our point, all instructions have to be read in context of the instructions. And the instruction just preceding it, the good faith, talks about the allegations that were false in the indictment. And then, of course, there's the clear instruction to the jury that they have to find a material misrepresentation. And the prior paragraph of this instruction makes it clear that they still have to prove, that the government still has to prove beyond a reasonable doubt that he acted with the appropriate intent to defraud. Absolutely. Which picks up some of that. Absolutely. Absolutely. And so, as this court's case law makes absolutely clear, absolutely again, is that it's got to be read in the context of all the instructions. So, in that context, in this case, the parade of horribles that the defendant is presenting to this court just have no basis on the record. Moreover, even if the evidence here of fraud and material misrepresentations in support of the jury's verdict is just overwhelming. Overwhelming. And on that issue, I know counsel spent a lot of time on sufficiency of the evidence. I haven't addressed it. If the court has any questions about anything, I'd be happy to. But the government argued from the get-go. And this, you know, one thing that they say in the reply brief is that, you know, we've created a lot of this on appeal. Everything in our brief came from what was in the trial record and, you know, argued to the jury. And I'd say to the court, I believe it's page 1597 if I'm remembering it right, but we argued right from the get-go that this started in 2003 with the phantom. And the phantom in particular, just briefly, is it was the voyager at Zentex. When he comes and he starts his company in Armada, he renames this product the phantom. And the testimony was from the person, his one employee, Van Der Zee, who had been with him at Zentex, came with him to Armada. And it's Van Der Zee who testifies. That product that we've now renamed the phantom was completely outdated in 2003 when he did this private offering memorandum. There were faster computers with longer memories. And we did nothing to update it. And yet he said, and for this one, Judge Wood, he didn't just say it was approaching market readiness. He said it was market ready and that it had capabilities not in any other, you know, laptop out there. Why charge as one big scheme as opposed to breaking it down? I think because it is one big scheme. You know, I think that it started in 2003 and the pattern was identical. You've got different products, different companies. Not really different products. Not nearly as many as examples from the early end of things. You have lots of examples as kind of starting in 2008 till the end, but it's a little thin. Well, 2003, it's all the way through, though, Your Honors, because it starts with the phantom, but then you've got the Radian, which, you know, when he ultimately starts Ideal Future, not only does he tell them they're not investors. This is just a renaming. It's essentially the same business. But he also tells them, and I pulled out the site for this because it's in our – I want to say it's in our appendix at 85, I believe, if my memory is serving me, that basically he tells them the Radian that we did at Armada, it's going to be a docking station now for the Dragonfly. And, in fact, one of the videos we supplement the record with, the Blackbird video, shows the Radian is now the Blackbird. I mean, these – you know, when you say separate products, they're not. They're just continuations. The Dragonfly was the stealth at Armada. It's all just one continuation of basically material lies to get money to make his dream. Who knows? But it's just lie after lie after lie about these products that start, you know, with the Radian, and the Radian continues all the way through Ideal Future. The stealth continues all the way through Ideal Future. And the evidence is it was one scheme, one single scheme. In fact, Your Honor, to answer your question, too, to charge them separately wouldn't have told the whole story. They would have had to get the other stuff in as 404B to show that how they were – because they were all so intertwined, really intertwined in this case. So unless the court has any other questions, the government would respectfully request that you affirm his conviction and sentence. Thank you, counsel. Mr. Lembo, anything further? Yes, Your Honor. I'd like to start, Your Honors, with the good faith jury instruction because this is a critical issue. The instruction itself states at the very end that a defendant's honest and genuine belief that he will be able to perform what he promised is not a defense to fraud if the defendant also knowingly made false and fraudulent misrepresentations. And the effect of this is that the government could identify a single misrepresentation and say that establishes not only the scheme because the government says that one material misrepresentation is enough to convict over a 13-year period, but also Mr. Badio's intent in making his statements. But what do you do with the preceding paragraph which absolutely clearly says the defendant does not have to prove his good faith, rather the government must prove beyond a reasonable doubt that the defendant acted with the intent to defraud? I mean, it's not like this additional sentence erases that other part of the instruction. Your Honor, the issue is that by focusing on Mr. Badio's good faith in bringing a product to market generally, it takes the attention away from his faith in making each individual statement. But you can't read jury instructions in isolation like that. The law is crystal clear that we read them as a whole. And the prior instructions clearly lay out the elements before you get to this. And as Judge Wood pointed out, that second paragraph makes crystal clear the government still has to prove the intent. Yes, Your Honor, but the last instruction, even in the context of all of the other good faith instructions, turns the jury's attention away from Mr. Badio's good faith in making the individual statements with which he's charged as opposed to his intent over the entire overarching endeavor. And, Your Honor, the Third Circuit, this was in the context of their entire good faith instruction. They had multiple good faith instructions, and they struck this paragraph out. We don't know why. There's nothing indicating why they did that. And the Basile case that you rely on doesn't help you because that's a tax fraud case where good faith is a complete defense. The comments, Your Honor, when it was removed, stated that it was removed because the Third Circuit observed in the Basile case that this language was confusing, even though there the court found it was harmless error. Why haven't you, I want to switch real quickly, why haven't you waived your restitution argument? You didn't object to it in writing. You didn't object to it at sentencing. And you strategically tried to get no jail time based on the argument that your client could pay back the restitution if he were able to work. Why isn't that a pure waiver of restitution? I would have to look into that further, Your Honor. I don't have the exact answer for you sitting here today, but I would say generally there were objections to the loss amount, and he made it very clear that that loss amount should not be as large as it was. Whether that implicates restitution, I'd have to follow up with Your Honor. Thank you, Mr. Lembo. Mr. Lembo, the court appreciates your willingness and that of your law firm to accept the appointment in this case and your assistance to the court as well as your client. The case is taken under advisement.